# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NESSCAP CO., LTD., <br><br>          Plaintiff/Counterdefendant, <br>  vs. <br><br> MAXWELL TECHNOLOGIES, INC., <br><br>          Defendant/Counterclaimant. | CASE NO. 07CV704 JLS (BLM) <br><br> **ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** <br><br> (Doc. No. 21) |

This action alleges infringement of Nesscap Co., Ltd.'s ("Nesscap" or "plaintiff") Patent No. 6,743,544 ("patent") by Maxwell Technologies, Inc. ("Maxwell" or "defendant"). The patent claims an electric energy storage device that reduces internal electric resistance between electrodes and their terminals. (Patent, at 1:8-9.) In its preliminary infringement contentions, plaintiff asserted that defendant's line of Medium Cell Boostcap Ultracapacitors infringed claim 1 of the patent. (Sharp Decla. ISO Motion, Exhibit F, at 67.) In claim 1, the patent claims, inter alia, "a pressure adjusting means inserted between the housing and the anode and cathode terminals so as to maintain a predetermined constant pressure between the electrode body and the anode and cathode terminals" and "a metal layer formed on surfaces of the first and second protrusions" of the electrodes. (Patent, at 8:58-63.)

Defendant moves for summary judgment of non-infringement because its ultracapacitors allegedly lack "pressure adjusting means" and a "metal layer." (Doc. No. 21.) For the reasons

1 stated below, the Court denies the motion. The denial is without prejudice.

## BACKGROUND

**A.     Factual Background**

An electric energy storage device provides electric energy to some external source. (Patent, at 1:13-17.) The storage device consists of an "electrode body," i.e., an anode electrode and cathode electrode, along with insulating film that separates the electrodes. (Id. at 3:45-55.) The storage device also includes an anode and cathode terminal, such that each electrode contacts its respective terminal (i.e., anode electrode to anode terminal, cathode to cathode). (Id. at 3:55-60.) The terminals are connected to the electrode body mechanically. (Id. at 7:59-64.) The electrode body is installed within a housing made of, e.g., metal or molding resin. (Id. at 6:45-46.)

The storage device can provide more energy if there is less internal resistance between the electrodes and terminals. (Id. at 1:17-20.) The internal resistance is less if the electrodes are shorter and/or have contact with the terminals over a larger surface area. (Id. at 2:65-67.) The patent claims an invention that reduces internal resistance by increasing the contact area in three ways. First, the electrodes are aligned in an offset manner, such that one end of each electrode protrudes out of the electrode body. (Id. at 5:24-27.) Second, the portion of the terminal that contacts the electrode is designed with an uneven surface of screw threads. (Id. at 5:60–6:12.) Third, a metal layer is added onto the electrodes by, e.g., applying a metal spray. (Id. at 8:9-12.)

The pressure adjusting means controls the contact pressure that the terminals apply to the electrode body. The contact pressure varies based on, inter alia, gases produced during operation, increases in temperature, or simply long-term use. (Id. at 6:54-62.) The pressure adjusting means, typically made of an elastic rubber packing, is located between the housing and the terminals. (Id. at 6:46-52.)

The initial patent application contained no claim with a "pressure adjusting means" limitation and included the "metal layer" limitation only in a dependent claim. (Sharp Decla. ISO Motion, Exhibit A, at 18-19.) The United States Patent Office initially rejected this application and an amendment, but finally accepted the inventor's submission of an independent claim containing limitations for both the "pressure adjusting means" and the "metal layer". (Id., Exhibits

1 | B & D.)

2 | In defendant's ultracapacitors, the anode and cathode terminals are welded to the anode
3 | and cathode ends of the electrode body. (Gallay Decla. ¶¶ 11-12.) The electrode body is inserted
4 | into a metal housing or "can", and the housing is then "necked", or compressed, around the
5 | electrode body to form shoulders. (Id. ¶¶ 8-9 & Fig. 4.) The anode terminal forms the base of the
6 | housing and is welded directly onto the anode electrode. (Id. ¶ 11 & Fig. 6.) The cathode terminal
7 | forms part of the cap of the housing for the ultracapacitor. (Id. ¶ 12.) To connect the cathode
8 | electrode to the cap/cathode terminal (so that electrical current can flow through both), the
9 | ultracapacitor includes an aluminum conductor[1] welded to the cathode electrode. (Id. & Fig. 7.)
10 | The aluminum conductor is then folded so the cap can be moved down to seal the housing. (Id. ¶
11 | 14 & Fig. 9.)

**B.      Procedural Background**

On December 14, 2006, plaintiff initiated the present action against defendant for patent infringement in the United States District Court for the District of Delaware. On January 3, 2007 defendant answered the complaint and filed counterclaims for declaratory judgments of invalidity and non-infringement. The action was transferred to this Court by Order dated April 13, 2007.

On June 27, 2007, defendant filed the present motion for summary judgment. (Doc. No. 21.) Plaintiff filed its opposition on August 27, 2007 (Doc. No. 22), and plaintiff replied on August 31, 2007 (Doc. No. 23).[2] The Court heard oral argument on the motion on November 30, 2007 and then took the matter under submission.

**LEGAL STANDARD**

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). To determine the existence of a genuine question of material fact, the Court views the evidence and resolves doubt in favor of the non-

---

[1] Plaintiff and its expert refer to the aluminum conductor as a "leafspring." (E.g., Opp., at 6; Anderman Decla. ¶ 17.)

[2] The case was originally assigned to the Hon. John A. Houston. By Order dated September 27, 2007, the case was reassigned to the Hon. Janis L. Sammartino. (Doc. No. 26.)

moving party. Gart v. Logitech, Inc., 254 F.3d 1334, 1339 (Fed. Cir. 2001).

In the context of patent litigation, a patent holder can prove infringement either literally or through the doctrine of equivalents. "Infringement is assessed by comparing the accused device to the claims; the accused device infringes if it incorporates every limitation, either literally or under the doctrine of equivalents. If, however, even one claim limitation is missing or not met, there is no literal infringement." MicroStrategy, Inc. v. Bus. Objects, S.A., 429 F.3d 1344, 1352 (Fed. Cir. 2005) (internal quotations and citations omitted). The doctrine of equivalents requires an "insubstantial" difference between the claimed invention and the accused product; in other words, "the accused product . . . performs [1] the substantially same function [2] in substantially the same way [3] with substantially the same result as each claim limitation[.]" Aquatex Indus., Inc. v. Technique Solutions, 479 F.3d 1320, 1326 (Fed. Cir. 2007) (emphasis added). "[T]he district court may find the absence of an equivalent where 'no reasonable jury could have found that the accused device has an equivalent to the disclosed structure.'" Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc., 389 F.3d 1370, 1378 (Fed. Cir. 2004) (quoting Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc., 145 F.3d 1303, 1309 (Fed. Cir. 1998)). Summary judgment is, however, inappropriate where there is a genuine factual dispute whether the allegedly infringing device includes a claim limitation. Int'l Rectifier Corp. v. IXYS Corp., 361 F.3d 1363, 1375 (Fed. Cir. 2004).

## DISCUSSION

**A.  Pressure Adjusting Means**

    1.  Legal standard for construing a means-plus-function limitation

Because the "pressure adjusting means" limitation uses the word "means," it is presumptively drafted in "means-plus-function" form. Wenger Mfg., Inc. v. Coating Mach. Sys., Inc., 239 F.3d 1225, 1232 (Fed. Cir. 2001) (quoting Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n, 161 F.3d 696, 703 (Fed. Cir. 1998)). A means-plus-function limitation is defined as follows:

> an element in a claim [that] may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112 ¶ 6. The Court's first step in interpreting the means-plus-function limitation is to identify the function in the claimed limitation. <u>ACTV, Inc. v. Walt Disney Co.</u>, 346 F.3d 1082, 1087 (Fed. Cir. 2003); <u>Omega Eng'g, Inc. v. Raytek Corp.</u>, 334 F.3d 1314, 1321 (Fed. Cir. 2003). Then, the Court examines the specification (<u>i.e.</u>, the written description of the invention) to determine the structure that corresponds to and performs that function. <u>ACTV</u>, 346 F.3d at 1087; <u>Omega Eng'g</u>, 334 F.3d at 1321. The structure corresponds to the function "'only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim'" such that "the structure must be necessary to perform the claimed function." <u>Omega Eng'g</u>, 334 F.3d at 1321 (quoting <u>B. Braun Med., Inc. v. Abbott Labs.</u>, 124 F.3d 1419, 1424 (Fed. Cir. 1997)).

    2.    <u>Whether the aluminum conductor is equivalent to an elastic rubber packing</u>

Defendant's argues that its ultracapacitors do not have the "pressure adjusting means" as claimed in the patent. The only[3] stated function of the pressure adjusting means is "to maintain a predetermined constant pressure between the electrode body and the anode and cathode terminals[.]" (Patent, at 8:58-61.) The only structure to perform this function disclosed in the patent is the elastic rubber packing. Where the specification only discloses one structure for performing the claimed function, the trial court should conclude that the disclosed structure corresponds to the claimed function. <u>Weatherford Int'l</u>, 389 F.3d at 1377. As plaintiff's counsel conceded at oral argument, defendant's ultracapacitors do not contain any elastic rubber packing. Therefore, the question before the Court is whether the aluminum conductor is equivalent to the elastic rubber packing.

In support of its argument that no reasonable jury could find the aluminum conductor to be an equivalent of elastic rubber packing, defendant submits the affidavits of Drs. Roland Gallay,

---

[3] Defendant identifies other functions for the pressure adjusting means. (<u>See</u> Memo. ISO Motion at, <u>e.g.</u>, 8:14-15 (arguing for no infringement because defendant's ultracapacitors "do not use a 'pressure adjusting means' to maintain contact between the terminals and electrodes") & 10:1-2 (claiming that the pressure adjusting means "press[es] both terminals against the electrode body"). The Court does not consider these functions because they appear outside of the body of the claim: the Federal Circuit has held a court "may not import functional limitations that are not recited" in a means-plus-function claim. <u>Wenger Mfg.</u>, 239 F.3d at 1233.

1  defendant's Research and Development Manager, and John R. Miller, a retained expert who is
2  president of a company specializing in capacitor product development, has published widely in the
3  capacitor field, and holds at least five patents in capacitor technologies.  Dr. Gallay's declaration
4  explains how defendant's ultracapacitors are assembled.  Dr. Gallay further asserts that necking
5  the housing around the electrode body and welding the housing to both terminals maintains the
6  contact between the electrode body and the terminals, rather than any pressure from the aluminum
7  conductor.  (Gallay Decla. ¶ 16.)  On the ultimate issue, Dr. Gallay concludes, "[t]here is no
8  structure between the housing and terminal, on either the anode or cathode end of the accused
9  ultracapacitors, that maintains a predetermined amount of pressure between the terminals and the
10  electrode body."  (Id.)

11  Dr. Miller began by visually inspecting defendant's intact ultracapacitor.  (Miller Decla. ¶
12  16.)  Dr. Miller then disassembled the ultracapacitor by removing the housing so that he could
13  examine the connections between the cathode terminals and electrode body.  (Id. ¶ 17.)  Dr. Miller
14  bent the aluminum conductor and found that it did not return to its original position.  (Id.)  Dr.
15  Miller concluded that the aluminum conductor "had none of the spring characteristics associated
16  with the 'pressure adjusting means' disclosed in the '544 patent."  (Id. ¶ 18.)  In a section of his
17  declaration devoted to infringement analysis, Dr. Miller ultimately concluded:

> there is no structure in [defendant's] capacitors . . . which functions as a "pressure adjusting means."  The metal strip on the cathode end of the device simply acts as an electrical bridge between the electrode body and the cathode terminal, it does not function to press the cathode terminal against the electrode body.  Moreover, [Dr. Miller] could identify no structure in the accused double layer capacitors that acted to press the electrode body against the terminals, and thus could function as a "pressure adjusting means."

22  (Id. ¶ 34.)

23  In opposition to summary judgment, plaintiff submits the affidavit of Dr. Menahem
24  Anderman, a retained expert who is president of a battery consulting firm, has published widely in
25  the field of battery and capacitor technologies, and holds six patents related to energy technology.
26  Dr. Anderman disassembled defendant's ultracapacitors and examined the design of the
27  components.  (Anderman Decla. ¶ 13.)  Dr. Anderman determined that the aluminum conductor is
28  "flexible".  (Id. ¶ 30.)  He further explained that, in prior art, "elastic rubbers and metal springs

were used interchangeably to maintain pressure[.]" (Id. ¶ 29.) Dr. Anderman ultimately concluded that the aluminum conductor "is equivalent to the elastic rubber packing in the '544 Patent," in the sense that it performs the substantially same function in the substantially same way to achieve the substantially same result. (Id.)

Based on these competing expert opinions, the Court finds that summary judgment is presently inappropriate on the issue of whether the aluminum conductor infringes the '544 Patent's "pressure adjusting means" limitation under the doctrine of equivalents. Although defendant cites Federal Circuit case law for the proposition that Dr. Anderman's declaration is a "conclusory expert opinion, unsupported by a specific factual basis" (Reply, at 2) and thus insufficient to oppose summary judgment, those cases are unavailing here. In Novartis Corp. v. Ben Venue Laboratories, Inc., the Federal Circuit conceded that it was "left completely in the dark" concerning the equations and theories that an expert utilized in a model of particle solubility, and, therefore, the court could not determine whether the expert's model accurately captured the process for designing the patented drug. 271 F.3d 1043, 1054 (Fed. Cir. 2001). In Arthur A. Collins, Inc. v. Northern Telecom Ltd., the Federal Circuit rejected "an unsupported assertion that the accused device contains a critical claim limitation" because "there [was] nothing in [the] declaration that would allow a finder of fact to conclude" the claim limitation was satisfied. 216 F.3d 1042, 1046 (Fed. Cir. 2000). Finally, in Zelinski v. Brunswick Corp., the Federal Circuit found the patentee did not survive summary judgment on equivalence by presenting an expert's unsupported statement that the existence of literal infringement also meant infringement under the doctrine of equivalents. 185 F.3d 1311, 1317 (Fed. Cir. 1999).

Dr. Anderman's declaration provides more detailed explanation and reasoning than the expert opinions held inadequate in these Federal Circuit cases. Dr. Anderman explained his methodology for inspecting defendant's ultracapacitors. He supported his conclusions about equivalence by finding that the aluminum conductor was "flexible" and referencing the interchangeability of metal and elastic in earlier designs. Dr. Anderman has presented the Court with enough support to allow a reasonable finder of fact to determine that defendant's devices infringe under the doctrine of equivalents.

1        Furthermore, Dr. Anderman's declaration is essentially a mirror image of the declarations
2   that defendant submitted in support of its motion.  Although defendant complains that Dr.
3   Anderman "conducted no tests" (Reply, at 5) to support his conclusions, Drs. Gallay and Miller
4   also did not conduct tests.  Experts for both sides disassembled defendant's ultracapacitors;
5   visually inspected the component parts, focusing on the aluminum conductor; and reached
6   opposing conclusions on infringement.  These opposing conclusions amount to a genuine dispute
7   of material fact.  In other words, if the Anderman Declaration is inadequate to oppose summary
8   judgment, then the Gallay and Miller declarations are likewise inadequate to warrant a grant of
9   summary judgment because they do not provide more detailed reasoning. The analytical and
10  methodological similarities in the declarations require the denial of summary judgment because
11  the Court must view the evidence in the light most favorable to plaintiff, the opponent of the
12  motion.  Gart, 254 F.3d at 1339.
13       Finally, defendant argues that the specification precludes an action for infringement
14  because the patent disclaims the prior art in which the terminals were welded to the electrode body
15  and claims an invention where the electrodes and terminals are mechanically connected.  "Where
16  the general summary or description of the invention describes a feature of the invention . . . and
17  criticizes other products . . . that lack that same feature, this operates as a clear disavowal of these
18  other products[.]" Astrazeneca, AB, Aktiebolaget Hassle, KBI-E, Inc. v. Mut. Pharm. Co., Inc.,
19  384 F.3d 1333, 1340 (Fed. Cir. 2004).  On the other hand, "general statements" describing the
20  invention's improvements over prior art "will not be interpreted to disclaim every feature of every
21  prior art device[.]" Ventana Med. Sys., Inc. v. Biogenex Labs., Inc., 473 F.3d 1173, 1181 (Fed.
22  Cir. 2006).  Here, the Court finds that the references to the welding together of electrode-terminal
23  connections in the prior art are insufficiently specific to amount to a disclaimer of welding in the
24  present invention.  A review of the specification shows that the patentee emphasized the ways in
25  which the invention increased the surface area of the connection between the electrode body and
26  terminal.  The references to welding are comparatively incidental.  Defendant fails to show, as a
27  matter of law, that the patent clearly disavowed prior art's reliance on welding technology.
28  //

    3.    <u>Whether the alleged "pressure adjusting means" is correctly located</u>

The patent requires the pressure adjusting means to be "inserted between the housing and the anode and cathode terminals." (Patent at 8:58-59.) Defendant argues that, even if the Court finds the aluminum conductor could be equivalent to the elastic rubber packing, its ultracapacitors are not located between the housing and the terminals. The Court rejects defendant's arguments with respect to both terminals.

    A.    CATHODE TERMINAL

According to defendant, the aluminum conductor is not located between the housing and the cathode terminal because the terminals "are integral parts of the housing, not separate structures as contemplated by the '544 patent." (Memo. ISO Motion, at 11:2-3.) Because the cathode terminal is part of the housing cap, there is allegedly nothing between the terminals and the housing. Specifically, the aluminum conductor is located between the cathode terminal and the cathode electrode, rather than between the terminal and the housing.

Plaintiff factually disputes what constitutes a "terminal" in defendant's ultracapacitors. Specifically, plaintiff asserts that the cathode terminal has both an elliptical base portion welded to the electrode, and an "outer post . . . [that] extends up through and above the housing." (<u>See</u> Opp., at 19 (reproducing Gallay Decla., Fig. 8).) The aluminum conductor is between the elliptical base and the housing. Saying that the aluminum conductor, as a matter of law, is not between the cathode terminal and the housing requires a <u>de facto</u> claim construction that the cathode terminal does not include the elliptical base. Dr. Anderman claims that such a construction would contradict the meaning of "terminal" to a person of ordinary skill in the art of capacitor design. (Anderman Decla. ¶ 18; <u>see</u> <u>Abbott Labs. v. Andrx Pharms., Inc.</u>, 473 F.3d 1196, 1209 (Fed. Cir. 2007) (claim construction requires a court to construe claim terms according to the meaning that they would have to persons of ordinary skill in the art).)

Summary judgment on this issue is premature until the Court has construed the meaning of "terminal." Prior to claim construction, the Court cannot find, as a matter of law, that the aluminum conductor (<u>i.e.</u>, the supposed "pressure adjusting means") is not located between the cathode terminal and the housing. At this point in the litigation, a reasonable juror could find that

the "cathode terminal" includes the elliptical base.  Defendant criticizes plaintiff's argument as saying that the aluminum conductor is both the pressure adjusting means and the cathode terminal. This criticism is not persuasive because a single physical structure can satisfy two claim limitations.  Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc., 336 F.3d 1308, 1320 n.9 (Fed. Cir. 2003) (citing In re Kelley, 305 F.2d 909, 915-16 (C.C.P.A. 1962)). Applied to these facts, the aluminum conductor could be part of the cathode terminal, as well as the pressure adjusting means.

### B. ANODE TERMINAL

Because the patent claims "a pressure adjusting means inserted between the housing and the anode and cathode terminals," defendant argues that the claim effectively requires two pressure adjusting means: one between the housing and anode terminal, and one between the housing and cathode terminal.  As a corollary, defendant argues that plaintiff failed to allege that defendant's ultracapacitators have a "pressure adjusting means" at the anode terminal.  Stated another way, the aluminum conductor exists only at the cathode terminal, whereas the anode electrode is welded directly to its terminal.

At this early stage in the litigation, before the Court has held a Markman hearing and construed the claim, the Court rejects defendant's arguments without prejudice.  According to Federal Circuit precedent, "an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'"  KCJ Corp. v. Kinetic Concepts, Inc., 223 F.3d 1351, 1356 (Fed. Cir. 2000).  Therefore, the claim language does not strictly require more than one pressure adjusting means.  Furthermore, at oral argument, plaintiff's counsel argued that the aluminum conductor is "between the housing and the anode . . . terminal[]" in the sense that the conductor is located between the housing cap (on the cathode end) and the anode terminal all the way on the other end of the ultracapacitor.  Counsel's statement is literally true: whether it is the proper construction of the claim remains to be determined.  For now, the Court denies the motion for summary judgment on the issue of whether defendant's devices have a "pressure adjusting means" between the housing and anode terminal.

//

1  **B.    Metal Layer**

2    Defendant argues that its device does not have the "metal layer" limitation of Claim 1. 3 According to the claim, the metal layer is "formed on surfaces of the first and second protrusions." 4 During the prosecution history, the patent examiner accepted the inventor's argument that prior art 5 "does not suggest electrode plates having a separate layer of a metal different from the substrate 6 metal at the [electrode] protrusions." (Sharp Decla, Exhibit C, at 50.) Maxwell's Research and 7 Development Manager declares, with supporting images, that Maxwell's ultracapacitors lack any 8 additional metal layer between the electrode body and the terminal. (Gallay Decla. ISO Motion ¶ 9 17 & Figures 11-12.)

10   Plaintiff asserts a dispute of fact, arguing that molten metal accumulates at the ends of the 11 electrodes, presumably as a result of the welding process. Upon visual inspection with 12 magnification, Dr. Anderman was able to locate these additional metal layers on both the anode 13 and cathode electrodes. (Anderman Decla. ¶¶ 21-23 & Figs. 3A-3B (cathode side), 4A-4B (anode 14 side).) The metal layers fill in spaces between the electrode protrusions and effectively increase 15 the contact area between the electrodes and terminals. (Id. ¶ 24.) Also, plaintiff invokes the 16 doctrine of claim differentiation to oppose defendant's argument that the patent requires spraying 17 the metal layers onto the electrode protrusions. The claim differentiation doctrine holds:

18/19/20
> the presence of a dependent claim that adds a particular limitation raises a [rebuttable] presumption that the limitation in question is not found in the independent claim. . . . [W]here the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim, the doctrine of claim differentiation is at its strongest.

21 Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 910 (Fed. Cir. 2004). Here claim 2 is a 22 dependent claim for "[t]he device of claim 1, wherein the metal layer is formed by plasma spray or 23 arc spray." (Patent, at 8:64-65.) Because claim 2 explicitly contains the spraying limitation, 24 plaintiff asks the Court to read claim 1 to allow metal layers formed in other ways, e.g., by 25 welding.

26   The Court denies summary judgment to defendant on the issue of whether defendant's 27 ultracapacitors have a metal layer. First, a genuine dispute of material fact exists as to whether 28 the small accumulation of molten metal at the ends of the electrodes satisfies the "metal layer"

1  limitation of the patent.  A reasonable jury could find that this accumulation is "formed on
2  surfaces of the first and second [electrode] protrusions," as the bare language of the claim requires.
3  Second, based on the doctrine of claim differentiation, claim 1 could be construed to allow metal
4  layers formed by methods other than spraying.  Because the Court has not yet conducted claim
5  construction, defendant may renew these arguments for summary judgment after the Court
6  construes the claims.

## CONCLUSION

At this stage of the litigation, a reasonable jury could find that defendant's ultracapacitors meet the "pressure adjusting means" and "metal layer" limitations of plaintiff's '544 patent. Genuine disputes of material fact preclude a finding of non-infringement, as a matter of law. Therefore, the Court **DENIES** defendant's motion for summary judgment.  The denial is **WITHOUT PREJUDICE**, and defendant may renew its motion after the Court holds a Markman hearing and issues its Order on claim construction.

Because of a conflict in the Court's calendar, the Court **RESCHEDULES** the Markman hearing from February 25, 2008 to Tuesday, April 8, 2008 at 9:00 a.m.  All other dates scheduled prior to February 25, 2008 (the claim construction briefs et al.) shall remain unchanged, unless the Court orders otherwise upon joint motion by the parties.

IT IS SO ORDERED.

DATED: December 5, 2007

*Janis L. Sammartino*
Honorable Janis L. Sammartino
United States District Judge